## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MELANIE TAYLOR, | ) | Civil Action No**. 1:13-cv-1416** |
|  | ) |  |
| *Plaintiff* | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ERIC K. SHINSEKI, | ) |  |
| SECRETARY OF VETERANS AFFAIRS | ) |  |
|  | ) |  |
| *Defendant* | ) | **DEMAND FOR JURY TRIAL** |
|  | ) |  |

## COMPLAINT

Plaintiff Melanie Taylor ("Taylor"), by and through her undersigned counsel, submits her Complaint against Defendant Eric K. Shinseki ("Shinseki"), Secretary of Veterans Affairs, for— *inter alia*—harassment based on sex in violation of Title VII of the Civil Rights Act of 1964, as amended, Section 701 *et seq*., 42 U.S.C 2000e *et seq*., assault, negligent hiring, training and supervision, and intentional infliction of emotional distress.

## PARTIES

1.  Taylor is, and at all times mentioned herein was, a sui juris adult resident in the state of Louisiana. Taylor belongs to protected classes under Title VII as a female African American with prior EEO activity. Taylor also belongs to a protected class under the Rehabilitation Act, 29 U.S.C. § 701 *et seq*., due to carpal tunnel syndrome, a physical disability.

2.  Shinseki is an officer or employee of the United States—or an agency thereof—acting in his official capacity as the Secretary of Veterans Affairs.

3. Shinseki is a sui juris adult resident in the District of Columbia.

1

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 451, 1331, 1337, and 1343. Supplemental jurisdiction is proper under 28 U.S.C. § 1367.

5.  Venue is proper under 28 USC § 1391(e)(1)(A) in that Shinseki resides in the District of Columbia.

6.  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201.1 and 2202.

## FACTUAL ALLEGATIONS

7.  Taylor works as a Licensed Practical Nurse ("LPN") at the Lafayette Community-Based Outreach Clinic ("LCBOC") in Lafayette, Louisiana. LCBOC is a subsidiary of the VA Medical Center in Alexandria, Louisiana.

8.  Taylor's first-level supervisor was Geralyn Shelvin ("Shelvin")—the acting Nurse Manager.

9.  Taylor's second-level supervisor was Barbara Nugent ("Nugent")–the Associate Chief Nurse.

10. Taylor's third-level supervisor was Amy Lesniewski ("Lesniewski")—Nurse Executive.

11. Mary Andrus ("Andrus") was a coworker and fellow LPN of Taylor who began working at the LCBOC in June 2011.

12. Between June 2011 and May 2012, Andrus engaged in a pattern and practice of making hostile, threatening and offensive comments about Taylor, and other coworkers, at the LCBOC.

13. Andrus did not make the hostile, threatening and offensive comments directly to Taylor, but to other coworkers when Taylor was not present.

14. On May 7, 2012, Taylor learned that Andrus has been telling colleagues that she was going to tie Taylor up, put her in the trunk, and throw her in the bayou. This threat of physical violence was voiced in the presence of other nurses at the LCBOC.

15. On May 7, 2012, Taylor learned that Andrus had been telling colleagues that Taylor was a "junkie."

16. On May 7, 2012, Taylor learned that Andrus had been telling colleagues that Taylor was dating another female coworker and that they were "gay."

17. On May 7, 2012, Taylor learned that Andrus had been telling colleagues that Taylor was "sleeping with patients for money."

18. On May 7, 2012, Taylor learned that Andrus had been telling colleagues that Taylor was jealous because she had been kicked out of the "RN clique."

19. On May 7, 2012, Taylor learned that Andrus falsely alleged to Nugent and an Office of Regional Management Alternative Dispute Resolution Manager that Taylor had been intimidating Andrus because of Taylor's position in the union.

20. On May 14, 2012, Taylor told her supervisor—Shelvin—that she wanted to meet with Shelvin and Andrus to discuss Andrus's inappropriate comments about Taylor.

21. On May 15, 2012, Taylor met with Shelvin and Andrus, along with two (2) witnesses.

22. During the meeting, Taylor discussed the comments made by Andrus and how disturbed she was by them. Andrus only responded by crying throughout the meeting, and at one point stating she was sorry if she hurt anybody.

23. But after the meeting, Andrus contacted Shelvin privately and denied all of Taylor's allegations.

24. Shelvin admitted under oath that she reported Andrus's threats of physical violence to Nugent, but neither Nugent nor Shelvin took any remedial action upon becoming aware of Taylor's hostile work environment allegations against Andrus.

25. The week following the May 15, 2013 meeting, Andrus contacted Lesniewski—the Nurse Executive in Alexandria—and falsely claimed that Taylor was bullying her and creating a hostile work environment. Andrus specifically claimed that Taylor had called a meeting and made false allegations against Andrus, thereby creating a hostile work environment towards Andrus.

26. In response to Andrus's claims, Lesniewski instructed Ulla Tademy ("Tademy")—Associate Chief of Nursing—to conduct a fact-finding investigation regarding "a possible hostile work environment" created by Taylor.

27. On June 19, 2012, Taylor learned that she was the target of a fact-finding investigation—based on the false allegations by Andrus—for creating a hostile work environment towards Andrus.

28. Taylor's hostile work environment was therefore exacerbated by Nugent and Shelvin's failure to act after the May 15, 2012 meeting.

29. That same day, Tademy was contacted by a union representative informing Tademy that it was Taylor who was being harassed by Andrus, not vice-versa.

30. On July 11, 2012, Taylor filed a formal Equal Employment Opportunity complaint alleging she was harassed by Andrus and that management failed to take appropriate action upon becoming aware of Taylor's hostile work environment allegations.

31. On September 26, 2012, the LCBOC facility Director temporarily reassigned Andrus to the Jennings, Louisiana facility and ordered an Administrative Investigation Board ("AIB") investigation into Taylor's hostile work environment allegations.

32. But Taylor remained in fear of imminent bodily harm from Andrus who—after returning from her temporary assignment at the Jennings facility—would seek revenge against Taylor.

33. On November 5, 2012, the AIB investigation found that Andrus had made the hostile, threatening and offensive comments about Taylor despite Andrus's denials. The AIB recommended that Andrus be permanently reassigned to a different facility, which was adopted by the agency.[1]

34. On August 21, 2013, the Department of Veterans Affairs Office of Employment Discrimination issued a final agency decision finding that "[Taylor] proved that she was subjected to harassment based on sex for which the Agency is liable."[2]

35. Prior to her employment at the LCBOC, Andrus was terminated from the St. Agnes Nursing home in Beaux Bridge, Louisiana for abusing at least two elderly residents—an 82-year old Alzheimer's patient and a 96-year old Alzheimer's patient.[3]

36. Andrus was subsequently arrested and charged with cruelty to the infirmed on June 23, 2000.[4]

---

[1] Exhibit "A"
[2] Exhibit "B"
[3] Exhibit "C"
[4] Exhibit "D"

## FIRST CLAIM FOR RELIEF

## TITLE VII HARASSMENT BASED ON SEX

37.  Taylor repeats, realleges and incorporates by reference paragraphs 1-36, inclusive, above, as if fully set forth herein.

38. During the course of Taylor's employment at the LCBOC, Shinseki, by and through his agents and employees, harassed Taylor because of her sex, in violation of Title VII of the Civil  Rights Act of 1964, 42 U.S.C. §2000e *et seq.*

39. The aforementioned harassment created an intimidating, oppressive, hostile and offensive work environment which interfered with Taylor's emotional and physical well-being.

40. Shinseki, by and through his agents and employees, failed to take all reasonable and necessary steps to eliminate harassment based on sex from the workplace and to prevent it from occurring in the future.

41.  As a direct, natural, proximate and foreseeable result of Shinseki's action and inaction, by and through his agents and employees, Taylor has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity and other non-pecuniary losses and intangible injuries.

## SECOND CLAIM FOR RELIEF

## ASSAULT

42. Taylor repeats, realleges and incorporates by reference paragraphs 1-41, inclusive, above, as if fully set forth herein.

43. At all times mentioned herein, Taylor was intentionally placed in reasonable apprehension of an imminent threat of physical harm as a direct result of Andrus's threats to tie Taylor up, put her in the trunk, and throw her in the bayou.

44. Andrus had a present ability to carry out her physical threats of violence during her employment at the LCBOC.

45. As a direct and proximate result of the acts and omissions of Shinseki, by and through his agents and employees, Taylor has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity and other non-pecuniary losses and intangible injuries.

## THIRD CLAIM FOR RELIEF

## NEGLIGENT HIRING, TRAINING AND SUPERVISION

46. Taylor repeats, realleges and incorporates by reference paragraphs 1-45, inclusive, above, as if fully set forth herein.

47. At all times mentioned herein, Shinseki's agents and employees were required to act under the direction and control, and pursuant to the rules, regulations, policies and procedures put in place by Shinseki.

48. At all times mentioned herein, Shinseki, by and through his agents and employees, acted in contravention of their duty of care to Taylor by negligently, carelessly and recklessly failing to properly train, supervise, control, direct, and monitor Andrus.

49. As a direct and proximate result of the acts and omissions of Shinseki, by and through his agents and employees, Taylor suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity and other non-pecuniary losses and intangible injuries.

## FOURTH CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

50.   Taylor repeats, realleges and incorporates by reference paragraphs 1-49, inclusive, above, as if fully set forth herein.

51. At all times mentioned herein, Shinseki, by and through his agents and employees, acted in concert and with full knowledge of the conduct of Andrus.

52. The conduct of Shinseki, by and through his agents and employees, was extreme and outrageous, with a complete disregard for Taylor's rights, creating a hostile work environment based on sex.

53. As a direct and proximate result of Shinseki's extreme, outrageous, and malicious conduct, Taylor suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity and other non-pecuniary losses and intangible injuries.

## FIFTH CLAIM FOR RELIEF

### VICARIOUS LIABILITY

54. Taylor repeats, realleges and incorporates by reference paragraphs 1-53, inclusive, above, as if fully set forth herein.

55. At all times mentioned herein, Shinseki, by and through his agents and employees, had direct supervision, control and decision-making authority over Andrus when the wrongful and negligent acts described herein were committed against Taylor.

56.  Shinseki, by and through his agents and employees, engaged in their wrongful conduct during the course and scope of their employment.

57. Shinseki, by and through his agents and employees, is vicariously liable for the wrongful conduct of his agents and employees under a theory of respondeat superior.

## PRAYER FOR RELIEF

Taylor respectfully prays that judgment in the amount of **TEN MILLION DOLLARS ($10,000,000)** against Shinseki, his agents and employees, jointly and severally, for the following:

A.  Actual damages;

B.  Compensatory damages;

C.  Punitive damages;

D.  Costs of suit and reasonable attorney's fees;

E.  Pre-judgment and post-judgment interest;

F.  A permanent injunction against future acts of harassment against Taylor; and

G.  For such other and further relief as the court may deem proper.

## JURY DEMAND

Taylor demands trial by jury.

DATED: September 18, 2013                  Respectfully submitted,


/s/  Dean Gregory_____
Dean Gregory, Esquire
**LAW OFFICES OF DEAN GREGORY**
1000 Connecticut Avenue NW
Suite 900
Washington, D.C. 20036
Telephone: (202) 905-8058
Facsimile: (202) 776-0136
E-mail: deangregory@ucla.edu

*Attorney for PLAINTIFF*

# EXHIBIT "A"

JAN-30-2013  15:25      OFFICE OF MC DIRECTOR                    318 483 5029      P.14

## Department of Veterans Affairs

# Memorandum

Date:   November 5, 2012

From:   Chairperson, Administrative Investigation Board

Subj:   AIB: Alleged Staff on Staff Conflict and Threats of Physical Violence at the Lafayette Community Based Outpatient Clinic (LCBOC)

To:     Interim Medical Center Director (502/00), Alexandria VA Health Care System

1. **AUTHORITY:** This investigation was authorized by Julie Catellier, Interim Medical Center Director, Alexandria VA Health Care System, by memorandum dated September 26, 2012.

   Sherlene Humphrey (Chair), LPN, Educator, Nursing Education, Alexandria VA Health Care System, Alexandria, Louisiana

2. **PURPOSE & SCOPE:** To investigate the facts and circumstances surrounding allegations of staff on staff conflict and threats of physical violence at the Lafayette Community Based Outpatient Clinic (LCBOC).

3. **INDIVIDUALS INTERVIEWED UNDER OATH:**

   Marie Williams
   Melanie Taylor
   Geralyn Shelvin
   Mary Andrus
   Myra Breaux
   Lynette Rutland
   Barbara Nugent
   Tammy Jenkins

4. **EXHIBITS:**

   List of exhibits attached to report

5. **FINDINGS OF FACTS:**

   a. Marie Williams and Melanie Taylor testified that Mary Andrus threatened to tie them up, put them in the trunk of a car and drive them into the bayou. This threat of violence was voiced in the presence of other nurses at the Lafayette CBOC. **(Exhibit 3, lines 18 – 23; Exhibit 7,**

VA FORM  2105
MAR 1989



VHA Core Values: Trust, Respect, Commitment, Compassion, Excellence

JAN-30-2013   15:25      OFFICE OF MC DIRECTOR                318 483 5029      P.15

Sample Memo
Page 2

       affidavit, **Myra Breaux**; Testimony, pg. 3, lines 16 – 23; Exhibit 12, affidavit, **Betty Whittaker**)

b. Mary Andrus denied making the threat. Mary Andrus stated that she felt that Marie Williams and Melanie Taylor were "Union Bullies" and used their position to intimidate her, Mary Andrus.**(Exhibit #14)**

c. Other nurses have testified that Mary Andrus made the threat of violence towards Marie Williams and Melanie Taylor. The nurses also stated that Mary Andrus created an environment of hostility by calling nurses derogatory names. ( **Exhibit # 8, Affidavit of Tammy Jenkins, pg 2, #6, pg. 4, paragraph #2)**

d. Witnesses have testified that Mary Andrus repeatedly called Marie Williams "Pizza Face", Melanie Taylor "Junkie", and Tammy Jenkins "Tar Baby". **(Exhibit # 7, Affidavit, Myra Breaux; Exhibit #8 ,Affidavit Tammy Jenkins, pg 4, paragraph #2)**

e. Nurses voiced concern that Mary Andrus would return from her detail at the Jennings CBOC and do them bodily harm. Tammy Jenkins stated that she may return and "kill everybody or do something". **(Exhibit #8, Testimony of Tammy Jenkins, pg. 10, lines 13 – 18; Exhibit #3, Testimony of Marie Williams, pg. 8, lines 8 – 14; Exhibit #7, Affidavit, Myra Breaux, pg 2, last paragraph)**

f. Geralyn Shelvin, Head Nurse, aware of hostility involving Marie Williams, Melanie Taylor, and Mary Andrus. Geralyn Shelvin met with Marie Williams, Melanie Taylor, Mary Andrus, and Lenwood Jenkins on May 15, 2012 to discuss ways to help clear up the environment of hostility. **(Exhibit #13, pg.1; Exhibit #15; Exhibit #17; exhibit #8, Affidavit, Tammy Jenkins, pg. 1, paragraph 2)**

g. Geralyn Shelvin testified that she was not aware of any threats of physical violence against Marie Williams and Melanie Taylor until two weeks prior to investigation. She testified that Melanie Taylor said in passing that Mary Andrus had threatened her, Melanie Taylor. Geralyn Shelvin also testified that she reported the allegation of a threat of physical violence to her supervisor, Barbara Nugent, RN, ACNS/Acute.

h. Barbara Nugent testified that she knew of no allegations of a threat of physical violence against anyone at the clinic. **(Exhibit #5, Testimony, Geralyn Shelvin, pg. 4, lines 14 – 25, pg. 5 lines 1 – 8, pg 8, lines 10 – 18)**

i. On September 25, 2012, Mary Andrus received a memo from Amy Lesniewski, Chief Nurse, detailing her, Mary Andrus, to the Jennings CBOC. **(Exhibit # 22)**

## 6. CONCLUSIONS:

<u>Conclusion 1:</u> The investigation concludes that Mary Andrus made threats of bodily harm to Marie Williams, Melanie Taylor, and Tammie Jenkins. Mary Andrus also created a hostile environment by calling coworkers

VA FORM
MAR 1989   **2105**



VHA Core Values: Trust, Respect, Commitment, Compassion, Excellence

JAN-30-2013  15:25        OFFICE OF MC DIRECTOR                    318 483 5029      P.16

Sample Memo
Page 2

derogatory names, and by maliciously saying that Melanie Taylor and Tammy Jenkins were gay. **(Exhibit #4 Testimony, Melanie Taylor, pg. 11, lines 14 – 25, Exhibit #7, Affidavit, Myra Breaux, pg. 1, #9; Exhibit #8, Affidavit, Tammy Jenkins, pg. 2, #6)**

Conclusion 2:   Mary Andrus does not acknowledge that her behavior has caused a hostile environment in the workplace and feels that she is the victim. **(MCM # 00-26, pg 8, APPENDIX B)**

Conclusion 3:
The investigation concludes that a fact finding of alleged staff on staff conflict and the threat of physical violence would have been beneficial prior to the AIB. **(Exhibit #18)**

7. **ADDITIONAL CONCERNS:**

   a) Concern among staff that once Mary Andrus completes her 120- day detail to the Jennings CBOC that she will return and seek revenge on the nursing staff. **(Exhibit #6, Testimony, Mary Andrus, pg 14, lines 8 – 16)**

   b) Staff also voiced concerns that nursing management will not act appropriately to protect them and are not following facility policies. **(Exhibit #23, HCSM # 07B-8, pg 2, #3, pg 5, section E, pg 12, section IX, A – B, pg 13, section B, Exhibit #24, MCM # 00-26, pg 2, #2, pg 2, section B, #2a – d, pg 3, #2a – b, pg. 4, section V, A – E, pg. 9, APPENDIX C)**

8. **RECOMMENDATIONS:**

   a) Mary Andrus remains at the Jennings CBOC;Offer of Employee Assistance Program ; Anger Management training.
   b) A permanent head Nurse for the Lafayette CBOC.
   c) Marie Williams and Melanie Taylor to present training on team building to the nursing staff at the Lafayette CBOC.
   d) Initiate CREW at the Lafayette clinic.
   e) Team Building in-services to be included in monthly staff meetings.
   f) Better communication among nursing management with the Lafayette CBOC nursing staff.
   g) Review MCM # 07B-8: Violent and Intimidating Behavior in the Workplace; and MCM # 00-26: Sexual Harassment
   h) Customer Service training for Lafayette CBOC nursing staff.

VA FORM
MAR 1989    **2105**



VHA Core Values:  Trust, Respect, Commitment, Compassion, Excellence

TOTAL P.16

# EXHIBIT "B"



**DEPARTMENT OF VETERANS AFFAIRS**
Office of Employment Discrimination Complaint Adjudication
Washington DC 20420

**AUG 2 1 2013**

**CERTIFIED MAIL**

Melanie Taylor
2711 E. Simcoe Street, Unit 12
Lafayette, LA 70501

In Reply Refer To:                OOD
ORM Case No. 2003-0502-2012103359

Dear Ms. Taylor:

Enclosed is a copy of the Department's final agency decision concerning the above referenced complaint.

The final decision concludes that you were subjected to harassment based on sex. The relief to which you are, or may be, entitled is explained fully in the "Remedial Relief" section of the enclosed decision. The Director of the facility where the discrimination occurred has been notified of this final decision and instructed to implement the relief and corrective action ordered in the decision.

If you are dissatisfied with this final decision, you may appeal in accordance with the statement of appeal rights contained in the decision. Also enclosed is EEOC Form 573 for use if you wish to file an appeal.

Sincerely yours,

MAXANNE R. WITKIN
Director

Enclosures

## CLAIMS

Whether Complainant was subjected to a hostile work environment based on her race,[1] disability, sexual orientation,[2] or prior EEO activity, when:

1. On May 7, 2012, she learned that her coworker had been telling colleagues that she was going to tie Complainant up, put her in the trunk, and throw her in the Bayou;

2. On May 7, 2012, she learned that her coworker had been telling colleagues that she was a "Junkie";

3. On May 7, 2012, she learned that her coworker had been telling colleagues that she was dating another female coworker and that they were "gay";

4. On May 7, 2012, she learned that her coworker had been telling colleagues that her coworker (not Complainant) was nicknamed "Tar Baby";

5. On May 7, 2012, she learned that her coworker had been telling colleagues that she was "sleeping with patients for money";

6. On May 7, 2012, she learned that her coworker had been telling colleagues that she was jealous because she had been kicked out of the "RN clique";

7. On May 7, 2012, she learned that her coworker had told the Associate Chief of Nursing and an ORM ADR Manager that she had been intimidating her because of her position in the union and that she is "messy and jealous of Mark"; and

8. On June 19, 2012,[3] she learned that management was initiating a fact-finding inquiry into her conduct for allegedly creating a hostile work environment.

---

[1] Complainant added race as a basis during her testimony. (Report of Investigation (ROI), Tab B1.)

[2] Although Complainant claimed that she was harassed based on her sexual orientation, or, more precisely, the perception of her sexual orientation, the claim will be properly analyzed on the basis of sex. See, Castello v. U.S. Postal Service, EEOC Request No. 0520110649 (2011) (discrimination based on sex-stereotype that women should only have sexual relationships with men can constitute discrimination based on sex; see also, Baker v. Social Security Administration, EEOC Appeal No. 0120110008 (2013) (The fact that a Complainant characterized the basis of discrimination as sexual orientation does not defeat an otherwise valid sex discrimination claim.) Specifically, because this case involves allegations regarding a pattern of comments about Complainant's sexuality, i.e., that she was engaged in a homosexual relationship with a coworker, a sexual harassment analysis is applicable and will be included in this decision. See, Brooker v. U.S. Postal Service, EEOC Request No. 0520110680 (2013).

[3] The date for this issue in the accepted claims was May 19, 2012. However, evidence in the record establishes that the fact finding was scheduled on June 19, 2012, not May 19, 2012. (ROI, Tabs B1-B8; C1.)

## SUMMARY OF FACTS

Complainant worked as a Licensed Practical Nurse (LPN) at the Lafayette Community-Based Outreach Clinic (LCBOC) in Lafayette, Louisiana, at the time relevant to this complaint. The LCBOC is a subsidiary clinic of the VA Medical Center in Alexandria, Louisiana. Complainant's first-level supervisor was Ms. GS, the Acting Nurse Manager, stationed at the LCBOC. Complainant's second-level supervisor was Ms. BN, the Associate Chief Nurse, stationed at the Alexandria VA Medical Center, located about two hours from the LCBOC. Complainant's third-level supervisor was Ms. AL, the Nurse Executive, also stationed at the Alexandria Medical Center. (ROI, Tabs B1; B4; B5.)

Ms. MA, another LPN, began working at the LCBOC in June 2011. Between June 2011 and May 2012, Ms. MA engaged in a pattern of making inappropriate comments about several of her coworkers at the LCBOC. Her inappropriate comments included stating that she wanted to tie-up some of her coworkers (including Complainant), put them in the trunk, and throw them in the Bayou. Her inappropriate comments also included using nicknames for her coworkers like "Pizza Face," for one coworker, "Junkie" for Complainant, and, for one dark-skinned African-American coworker, "Tar Baby." Ms. MA's inappropriate comments also included statements about Complainant being kicked out of the "RN clique," sleeping with patients for money, and engaging in a homosexual relationship with a female coworker. Ms. MA did not make the inappropriate comments directly to the coworkers she targeted but, made the comments about her coworkers to other coworkers when they were not present. Several employees of the LCBOC witnessed her making the comments. (ROI, Tabs B1-B8; C3; C4.)

On May 7, 2012, Ms. BW, a LPN at the LCBOC who heard Ms. MA's inappropriate comments about Complainant and others, informed Complainant about the inappropriate comments. On May 14, 2012, Complainant told her supervisor, Ms. GS, that she wanted to meet with her and Ms. MA to discuss the inappropriate comments made about her. On May 15, 2012, Complainant met with Ms. GS, Ms. MA, and two witnesses, Mr. LJ and Ms. MW. During the meeting, Complainant discussed the comments she had been told were made by Ms. MA and how disturbed she was by them. Ms. MA did not respond other than by crying throughout the meeting, at one point stating that she was sorry if she hurt anyone. After the meeting, Ms. MA contacted Ms. GS privately and denied all of Complainant's allegations. Ms. GS took no action in response to Complainant's allegations raised at the meeting. (ROI, Tabs B1-B8.)

During the week following the May 15, 2012 meeting, Ms. MA contacted Ms. AL, the Nurse Executive stationed in Alexandria, and reported that Complainant was bullying her and creating a hostile work environment. Specifically, Ms. MA reported to Ms. AL that Complainant had called a meeting and made false allegations against her, thereby creating a hostile work environment. In response to Ms. MA's report, Ms. AL instructed the Associate Chief of Nursing, Ms. UT, to conduct a fact-finding investigation to gather

evidence related to "a possible hostile work environment" created by Complainant. Ms. UT scheduled fact-finding interviews for June 20, 2012, notifying Ms. GS, Complainant, and other relevant witnesses on June 19, 2012, of their required participation.  On the afternoon of June 19, 2012, Ms. UT was contacted by Mr. BJ, a union representative, who informed her that it was Complainant who was being harassed by Ms. MA, not vice-versa, and that the fact-finding was "illegal" and constituted further harassment against Complainant.  Ms. UT informed Ms. AL of Mr. BJ's report.  Ms. AL responded by cancelling the fact-finding investigation.  No further action was taken in response to Ms. MA's allegations against the Complainant. (ROI, Tabs B6; B7; C1.)

On July 11, 2012, Complainant filed  a formal EEO complaint alleging she was harassed by Ms. MA and that management failed to take appropriate action once they became aware of her hostile work environment allegations.  On September 26, 2012, the Director of the facility temporarily reassigned Ms. MA to a different CBOC in Jennings, Louisiana, and ordered an Administrative Investigative Board (AIB) to investigate the hostile work environment claims made by Complainant and Ms. MA. The AIB conducted a thorough investigation and found that Ms. MA had made the inappropriate comments as alleged by Complainant, despite Ms. MA continued denials. As a result of the AIB, Ms. MA was permanently reassigned to the Jennings CBOC. (ROI, Tabs B1-B8; C3.)

Complainant suffers from carpal tunnel syndrome and filed an EEO complaint in May 2011 alleging discrimination based on a disability. (ROI, Tabs B1; C6; C11.)

## ANALYSIS

### 1. Statement of Applicable Law

The law prohibiting discrimination based on race, sex and/or reprisal is Title VII of the Civil Rights Act of 1964, as amended, Section 701 et seq., 42 U.S.C. 2000e et seq. ("Title VII").  The law prohibiting discrimination based on disability is the Rehabilitation Act of 1973, as amended, 29 U.S.C. 706; 791 et seq.  Complaints of disability discrimination alleging disparate treatment are analyzed using the analytical model developed under Title VII case law.  Prewitt v. U.S. Postal Service, 662 F.2d 292 (5th Cir. 1981).  Federal sector equal employment opportunity regulations are set out in 29 C.F.R. Part 1614.

Generally, the adjudication of a complaint of discrimination alleging disparate treatment under Title VII and or the Rehabilitation Act follows a three-step evidentiary analysis. First, the burden is on the complainant to establish a prima facie case of discrimination by a preponderance of the evidence.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Board of Trustees of Keene State College v. Sweeney, 439 U.S. 24 (1978); Furnco Construction Corporation v. Waters, 438 U.S. 567 (1978).  This means that the complainant must present a body of evidence such that, were it not rebutted, the trier of fact could conclude that unlawful discrimination did occur.  Teamsters v. U.S., 431 U.S.

324 (1977). A complainant raises an inference of discrimination by showing that the reasons most commonly given by management to justify a particular employment decision or action do not apply in the complainant's case.

Second, if the complainant meets the burden of presenting a prima facie case, then management has a burden of production to articulate some legitimate, nondiscriminatory reason for its actions. Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). The evidence presented by management need not establish management's actual motivation, but must be sufficient to raise a genuine issue of material fact as to whether management discriminated against the complainant. If management meets this burden of production, the presumption of discrimination raised by the prima facie case is rebutted and drops from the case altogether. Burdine, 450 U.S. at 253.

Third, in order to prevail, the complainant must show by a preponderance of the evidence that management's stated reason is a pretext for discrimination. Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Burdine, 450 U.S. at 256; McDonnell Douglas, supra. The complainant may show pretext by evidence that a discriminatory reason more likely than not motivated management, that management's articulated reasons are unworthy of belief, that management has a policy or practice disfavoring the complainant's protected class, that management has discriminated against the complainant in the past, or that management has traditionally reacted improperly to legitimate civil rights activities. McDonnell Douglas, supra.

The ultimate burden of showing that management intentionally discriminated against the complainant remains at all times with the complainant. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983); Burdine, 450 U.S. at 257. A finding of pretext — i.e., a finding of sufficient evidence to disbelieve management's stated reason for its decision -- does not necessarily compel a finding of discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993). Proof of pretext is simply one form of circumstantial evidence that is probative of intentional discrimination, and such proof may be quite persuasive. Thus, a complainant's prima facie case, when combined with sufficient evidence to find that management's asserted justification is false, may permit a finding of discrimination. Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097 (2000). This is not to say that such a showing will always be adequate to find discrimination. As the Supreme Court noted in Reeves, there will certainly be instances where, despite such a showing, the record conclusively reveals some other nondiscriminatory reason for management's decision, or if the complainant presented only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred. Thus, for example, if the circumstances show that management gave a false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent. Reeves, supra (citing Fisher v. Vassar College, 114 F.3d 1332, 1338 (2nd Cir. 1997). Whether a finding of discrimination is appropriate in a particular case will depend on a number of factors, including the strength of the complainant's prima facie case, the probative value of the

5

proof that management's explanation is false, and the strength of other evidence that discrimination did not occur. Reeves, supra.

Moreover, the analytical framework in McDonnell Douglas "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Furnco, 438 U.S. at 577. Thus, whether or not a complainant has established a prima facie case, where management has provided a legitimate, nondiscriminatory explanation for its action, the factual inquiry must proceed to a decision on the ultimate factual issue in the case -- i.e., whether management's actions were discriminatory within the meaning of Title VII. Aikens, supra.

**Prima Facie Case**

The elements of a prima facie case of discrimination are determined by the factual circumstances of the case and the bases of discrimination alleged. McDonnell Douglas, 411 U.S. at 802 n.13. In order to establish a prima facie case of disparate treatment, a complainant must generally show (1) membership in a protected class, (2) an employment situation comparable to that of other employees not of the same protected class, and (3) treatment that is different than that experienced by those other employees with respect to the terms, conditions, or benefits of employment. McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976); Scott v. Secretary of Defense, EEOC Appeal No. 01902727 (September 24, 1990).

Employees are in comparable employment situations when it is reasonable to believe that they would receive the same treatment in the context of a particular employment decision. See, Lindemann & Grossman, Employment Discrimination Law, 3rd Ed., Chapter 2, pp. 30-33 (1996). In order for comparative employees to be considered similarly situated, all relevant aspects of the complainant's situation must be nearly identical to those of the comparative employees. O'Neal v. Postmaster General, EEOC Request No. 05910490 (July 23, 1991); Powell v. Postmaster General, EEOC Appeal No. 01911979 (November 25, 1991). Thus, in order to be similarly situated, the comparative employees must have dealt with the same supervisor and have been subject to the same standards. Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992).

Even in cases where there are no similarly situated employees, a complainant may be able to establish a prima facie case by showing: (1) membership in a protected class; (2) the occurrence of an adverse employment action; and (3) some evidence of a causal relationship between membership in the protected class and the adverse action. Ward v. U.S. Postal Service, EEOC Request No. 05920219 (June 11, 1992), citing Potter v. Goodwill Industries of Cleveland, 518 F.2d 864 (6th Cir. 1975) and Leftwich v. United States Steel Corporation, 470 F. Supp. 758 (W.D. Pa. 1979).

## Disability Discrimination

As noted above, the Rehabilitation Act, 29 U.S.C. § 701 et seq., and EEOC's implementing regulations prohibit discrimination against qualified individuals with disabilities.[4] Allegations of disparate treatment due to a disability are analyzed according to the traditional burdens of proof in disparate treatment cases involving other prohibited bases. Prewitt v. U.S. Postal Service, 662 F.2d 292 (5th Cir. 1981).

To establish a prima facie case of disability discrimination under the disparate treatment theory, a complainant must generally show: (1) the existence of a disability; (2) that he or she is a "qualified" individual; (3) knowledge by the employer of the disability; and (4) an adverse personnel action[5] under circumstances giving rise to an inference of disability discrimination (e.g., treated differently than similarly situated employees who are not disabled or who have different disabilities). See, e.g., Prewitt, supra; Oberg v. Department of the Navy, EEOC Request No. 05890451 (1989); French v. Veterans Administration, EEOC Review No. 03880005 (1989).

Subject to certain exceptions, the term **disability** means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of the individual; a record of such an impairment; or being regarded as having such an impairment. 29 C.F.R. § 1630.2(g).[6]

**Major life activities** are those basic activities, including major bodily functions, that most people in the general population can perform with little or no difficulty.   Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working. Major bodily functions include, but are not limited to, functions of the immune system, special sense organs, and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive systems. 29 C.F.R. § 1630.2(i).

---

[4]   The Commission's regulation implementing the Rehabilitation Act is codified at 29 C.F.R. § 1614.203. For the most part, however, this regulation simply references the standards contained in the Americans with Disabilities Act of 1990 (ADA), as amended by the ADA Amendments Act of 2008 (ADAAA), and the Commission's ADA regulation, which is codified at 29 C.F.R. Part 1630. Pursuant to the Rehabilitation Act Amendments of 1992, interpretations of Titles I and V of the ADA, as they relate to employment discrimination, also apply to claims brought under the Rehabilitation Act. 29 U.S.C. § 501(g).

[5]   A prohibited action based on an actual or perceived impairment includes, but is not limited to, an action based on a symptom of such an impairment, or based on medication or any other mitigating measure used for such an impairment. 29 C.F.R. § 1630.2(l).

[6]   Exceptions to the definition of the term "disability" are set out at 29 C.F.R. § 1630.3.

An impairment is a disability if it **substantially limits** the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered a disability. 29 C.F.R. § 1630.2(j)(1).[7] The determination of whether an impairment substantially limits a major life activity is made without regard to mitigating measures, such as medicines, assistive technology, auxiliary aids or services, prosthetic devices, or learned compensating behaviors or adaptations.[8] An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability. An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. Temporary, non-chronic impairments of short duration with little or no residual effects usually will not substantially limit a major life activity.[9]

The term **qualified**, with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position. 29 C.F.R. § 1630.2(m).[10]

The term **essential functions** means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position. 29 C.F.R. § 1630.2(n).[11]

**Reprisal**

Title VII prohibits employer actions that are based on a retaliatory motive and are likely to dissuade a reasonable employee or applicant from engaging in protected EEO activity. See, Burlington Northern and Santa Fe Railway Co. v. White, 548 U.S. 53, (2006). See, also 42 U.S.C. 2000e – 3(a). In cases involving reprisal, the criteria for establishing a prima facie case may require a showing that (1) the complainant engaged in a protected activity, (2) management was aware of the complainant's participation in the protected activity, (3) management effected some action which adversely impacted upon the complainant following the protected activity, and (4) the management action followed the protected activity within such a period of time that a retaliatory motive can

---

[7] Rules of construction for the term "substantially limits" are prescribed in 29 C.F.R. § 1630.2(j)(2).

[8] However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

[9] Such impairments may include the common cold, seasonal or common flu, sprains, minor gastrointestinal disorders, or a broken bone that is expected to heal completely.

[10] See 29 C.F.R. § 1630.3 for exceptions to this definition.

[11] See 29 C.F.R. § 1630.2(n)(2) and (3) for examples of reasons why a job function may be considered essential, and evidence as to whether a particular job function is essential.

be inferred. <u>Hochstadt v. Worcester Foundation for Experimental Biology, Inc.</u>, 425 F. Supp. 318 (D. Mass. 1976), aff'd, 545 F.2d 222 (1st Cir. 1976).

The action required in the third element need not be an ultimate, or even significant, personnel action.  Therefore, any action by a management official likely to dissuade a reasonable employee or applicant from making or supporting a charge of discrimination is sufficient to satisfy this element of a <u>prima facie</u> case of reprisal.  Petty slights, minor annoyances, and simple lack of good manners normally will not create such deterrence.  <u>See, Burlington Northern, supra.</u> (finding that an assignment to more arduous and less desirable job duties, even if such duties fall within the scope of the complainant's job description, was likely to dissuade the plaintiff from making or supporting a charge of discrimination).   <u>See, also, EEOC Compliance Manual</u>, Vol. 2, Section 8, pp. 8-13 (Retaliation).

However, to ultimately prevail in a case alleging reprisal, it is not sufficient for the complainant to show that his or her protected EEO activity was a motivating factor in the employment action at issue.  The complainant must show that the alleged retaliatory action would not have occurred "but for" his or her participation in protected EEO activity. <u>Univ. of Texas Southwestern Med. Ctr. v. Nassar</u>, U.S. No. 12-484 (2013).

**Sexual Harassment**

Both the Equal Employment Opportunity Commission and the courts have long recognized that sexual harassment in the workplace constitutes a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.  <u>See, e.g.</u>, <u>Henson v. City of Dundee</u>, 682 F. 2d 897 (11th Cir. 1982), <u>Katz v. Dole</u>, 709 F. 2d 251 (4th Cir. 1983), <u>Bundy v. Jackson</u>, 641 F.2d 934 (D.C. Cir. 1981).   <u>EEOC Policy Guidance on Current Issues of Sexual Harassment</u>,  8 Fair Empl. Prac. Manual (BNA) 405:6681, 6689 (No. 915-050, March 19, 1990).

Sexual harassment is defined by EEOC's regulations published in 29 C.F.R. Section 1604.11.  The regulations state in pertinent part:

(a) Harassment on the basis of sex is a violation of section 703 of Title VII.  Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Title VII prohibits sexual harassment between members of the same sex as well as harassment between members of the opposite sex.  <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75 (1998).

A violation of Title VII may be predicated on either of two types of sexual harassment. The first type, quid pro quo sexual harassment, results in the denial of specific employment benefits because of a refusal to submit to sexual advances. The second type, "hostile environment" sexual harassment, does not directly affect economic benefits, but creates a hostile or offensive working environment. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, (1986).

In order to establish a prima facie case of hostile environment sexual harassment, the complainant must present evidence: (1) that she belongs to a protected class; (2) that she was subjected to unwelcome verbal or physical conduct of a sexual nature; (3) that the harassment complained of was based on sex; and (4) that the harassment was sufficiently severe or pervasive to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably interfering with [his] [her] work performance and/or of creating an intimidating, hostile, or offensive work environment. McGinnis v. Secretary of Defense, EEOC Appeal No. 01902760 (November 15, 1990); Sexton v. U. S. Marine Corps, EEOC Appeal No. 01821475 (August 30, 1983); Cudjoe v. Secretary of the Navy, EEOC Appeal No. 01880743 (June 14, 1988). In cases of sexual harassment by coworkers or other nonsupervisors, the complainant must also show as part of the prima facie case that management failed to take prompt and appropriate action although it was aware of the harassment. Lutticken v. Secretary of Health and Human Services, EEOC Request No. 05900386 (April 27, 1990).

Title VII does not proscribe all conduct of a sexual nature in the work place. Sexual flirtation or innuendo, and even vulgar language that is trivial or merely annoying, would probably not establish a hostile working environment. EEOC: Policy Guidance on Current Issues of Sexual Harassment, supra. For sexual harassment to be considered discriminatory, it must be pervasive or severe. Hicks v. Gates Rubber Co., 833 F.2d 1406 (10th Cir. 1987). Actual psychological or emotional injury is not required. Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993) (so long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious). However, unless the conduct is very severe or persistent, a single incident or group of isolated incidents will not be regarded as discriminatory harassment. See e.g. Scott v. Sears Roebuck and Co., 605 F. Supp. 1047 (DC Ill 1985), aff'd, 798 F.2d 210 (7th Cir. 1986); Hansen v. Rice, EEOC Appeal No. 01920621 (September 10, 1992).

The following factors are pertinent to determining whether a work environment is hostile, intimidating, or abusive: (1) whether the conduct in question is verbal or physical, or both; (2) whether the conduct was repeated, and, if so, how frequently; (3) whether the conduct was hostile or patently offensive; (4) whether the alleged harasser was a supervisor or a coworker; (5) whether more than one person joined in the harassment; and (6) whether the harassment was directed at more than one individual. King v. Hillen, 21 F.3d 1572 (Fed. Cir. 1994); Crane, EEOC Appeal No. 01924585 (April 22, 1993). Evidence of the general working atmosphere involving employees other than the complainant is also relevant to the issue of whether a hostile work environment exists.

Vinson v. Taylor, 753 F.2d 141 (D.C. Cir. 1985), aff'd in relevant part and rev'd in part, sub nom Meritor Federal Savings Bank v. Vinson, 477 U.S. 57 (1986); Delgado v. Lehman, 665 F. Supp. 460 (E.D. Va. 1987).

The conduct in question should be evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred. Highlander v. K.F.C. National Management Co., 805 F.2d 644 (6th Cir. 1986). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview. Harris, p. 228. Title VII does not serve "as a vehicle for vindicating the petty slights suffered by the hypersensitive." Zabkowicz v. West Bend Co., 589 F.Supp. 780, 784 (E.D. Wis. 1984). Thus, if the challenged conduct would not substantially affect the work environment of a reasonable person, no violation should be found. EEOC: Policy Guidance, 405: 6689. Furthermore, if the complainant does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of employment, and there is no Title VII violation. Harris, pp. 227, 228.

A prima facie case of hostile environment sexual harassment may be rebutted by the production of evidence to show that: (1) the alleged conduct did not occur; (2) the conduct complained of was not unwelcome; and/or (3) the alleged harassment was not sufficiently severe or pervasive to adversely affect the complainant's employment opportunities, to unreasonably interfere with the complainant's performance, or to create an abusive working environment. McGinnis, EEOC Appeal No. 01902760; Quinn v. Postmaster General, EEOC Request No. 05900546 (August 23, 1990); Crane v. Postmaster General, EEOC Appeal No. 01924585 (April 22, 1993).

Even where harassment has occurred, management may avoid Title VII liability for the harassment by showing that: (1) management took prompt, effective, and appropriate remedial action as soon as it became aware of the circumstances (a defense which applies only to sexual harassment by coworkers or other nonsupervisors); and/or (2) there is no basis under agency principles for imputing liability to the employer. McGinnis, EEOC Appeal No. 01902760; Quinn v. Postmaster General, EEOC Request No. 05900546 (August 23, 1990); Crane v. Postmaster General, EEOC Appeal No. 01924585 (April 22, 1993).

Under agency principles, management is liable for sexual harassment by a supervisor with immediate or successively higher authority over a victimized employee. The supervisor must have the power to make a significant change in the employee's employment status, such as through hiring, firing, failing to promote, reassignment with significantly different responsibilities or causing a significant change in benefits. Vance v. Ball State Univ., U.S. No. 11-556 (2013). However, where no tangible employment action has been taken by the supervisor, management may avoid liability by showing: (1) that management exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the complainant unreasonably failed to take advantage of any preventative or corrective opportunities provided by management or to avoid

harm otherwise.  Management bears the burden of proof on this affirmative defense. Management may not avoid liability when the supervisor's harassment culminates in a tangible employment action.  A "tangible" employment action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, demotion, or a decision causing a significant change in benefits.  Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

Applying the foregoing principles to the complainant's allegation of sexual harassment, we must first determine whether the alleged harassing conduct occurred.  Then we must determine whether the conduct that occurred constitutes sexual harassment within the meaning of Title VII.  If discriminatory sexual harassment is found, we must then determine whether management is liable for the harassment.

**Harassment**

Discriminatory harassment based on race, sex, reprisal, disability or other prohibited discriminatory bases is similar to hostile environment sexual harassment, except that it is not sexual in nature.  Thus, in order to establish a prima facie case of harassment based on race, sex, reprisal, or disability, the complainant must present evidence on each of the harassment elements described above, except that he need not show that he was subjected to unwelcome verbal or physical conduct *of a sexual nature*. Otherwise, the analysis of an allegation of discriminatory harassment based on race, sex, reprisal, disability, or other discriminatory bases follows the same principles described above for hostile environment sexual harassment.  See, e.g., Deffenbaugh-Williams v. Wal-Mart Stores, 156 F.3d 581 (5th Cir. 1998) (applying the liability principles in sexual harassment cases established in Faragher and Ellerth to claims of racial harassment).

Specifically harassment based on race, sex, prior EEO activity and/or disability consists of personal slurs or other denigrating or insulting verbal or physical conduct relating to an individual's race, sex, prior EEO activity and/or disability.  See, e.g., 29 C.F.R. Section 1606.8 (national origin discrimination).  Harassment directed against an individual because of that individual's race, sex or sexual orientation, prior EEO activity and/or disability may violate Title VII and/or the Rehabilitation Act.  Davis v. U.S. Postal Service, EEOC Appeal No. 01832914 (July 23, 1987); Criner v. Department of the Navy, EEOC Request No. 05880097 (July 21, 1988).

In cases involving harassment, court and EEOC decisions have modified somewhat the McDonnell Douglas analytical approach in order to achieve "a sensible, orderly way to evaluate the evidence."  To establish a prima facie case of harassment, the complainant must show: (1) membership in a protected class; (2) unwelcome personal slurs or other denigrating or insulting verbal or physical conduct ; (3) that the harassment complained of was based on the complainant's membership in the protected class; and (4) that the harassment was sufficiently severe or pervasive to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably

interfering with complainant's work performance and/or that the harassment had the purpose or effect of creating an intimidating, hostile, or offensive work environment. Compare <u>McGinnis v. Secretary of Defense</u>, EEOC Appeal No. 01902760 (November 15, 1990); <u>Sexton v. U. S. Marine Corps</u>, EEOC Appeal No. 01821475 (August 30, 1983); <u>Cudjoe v. Secretary of the Navy</u>, EEOC Appeal No. 01880743 (June 14, 1988); 29 C.F.R. Section 1604.11 (sexual harassment). In cases involving harassment by coworkers, the complainant must also show as part of the prima facie case that management failed to take prompt and appropriate action although it was aware of the harassment. <u>Lutticken v. Secretary of Health and Human Services</u>, EEOC Request No. 05900386 (April 27, 1990).

For harassment to be considered discriminatory, it must be severe or pervasive. <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17 (1993). Actual psychological or emotional injury is not required. <u>Harris</u>, <u>supra</u>. However, unless the conduct is very severe or persistent, a single incident or group of isolated incidents will not be regarded as discriminatory harassment. <u>See</u> e.g. <u>Scott v. Sears Roebuck and Co.</u>, 798 F.2d 210 (7th Cir. 1986); <u>Hansen v. Rice</u>, EEOC Appeal No. 01920621 (September 10, 1992). "Harassment, as the term is used in Title VII cases, refers to more than being subjected to stress." <u>Lin v. U.S. Postal Service</u>, EEOC Appeal No. 01932880 (December 23, 1993).

A showing of discriminatory harassment "must include discrete comments directed against the complainant or disparate treatment which supports an inference of discriminatory harassment." <u>Lin</u>, EEOC Appeal No. 01932880.

## 2. Discussion

### Harassment Based on Disability, Race, and Reprisal for Prior EEO Activity

Complainant belongs to protected classes under Title VII due to her race, sex,[12] and prior EEO activity.  She also belongs to a protected class under the Rehabilitation Act due to her carpal tunnel syndrome, a physical disability. (ROI, Tab B1.)

Complainant failed to show that she was subjected to unwelcome personal slurs or other denigrating or insulting verbal or physical conduct based on her disability, race, or prior EEO activity.  A successful harassment claim must include personal slurs or other denigrating or insulting verbal or physical conduct relating to an individual's protected category.  <u>See</u> 29 C.F.R. § 1606.8 (national origin discrimination); <u>Meyer v. Dep't of Agriculture</u>, EEOC Appeal No. 0120082537 (2008) (finding no harassment given the absence of unwelcome personal slurs or other denigrating or insulting verbal or physical conduct).  Complainant did not allege that any individual made discriminatory comments or gestures regarding her disability, her African-American race or her prior EEO activity.  She did not present evidence of denigrating verbal or physical conduct based on her disability, race, or prior EEO activity. (ROI, Tabs B1-B8.)

---

[12] The issues Complainant alleged to have been based on her sex are examined separately in a sexual harassment analysis, herein.

As evidence of reprisal, Complainant testified that she believed management failed to stop the harassment perpetrated by Ms. MA because management officials were angry about her discrimination allegations.  However, she did not substantiate her testimony with corroborative evidence.  She testified that Ms. AL ordered the June 20, 2012, fact-finding investigation as an act of reprisal because she had reported discriminatory harassment at the May 15, 2012 meeting.  If Ms. AL had been made aware of Complainant's May 15, 2012, report of discriminatory harassment and ordered the June 20, 2012, fact-finding as retaliation for Complainant's reports of discrimination, such an order would amount to reprisal.[13]  However, the evidence establishes that Ms. AL was unaware of Complainant's May 15, 2012, report of discriminatory harassment when she ordered the June 20, 2012, fact-finding investigation.  In fact, Ms. AL was unaware of Complainant's May 15, 2012, report of harassment because Ms. GS, the supervisor to whom Complainant reported the discriminatory harassment on May 15, 2012, failed to take any action, including failing to report the harassment allegations to Ms. AL through the chain of command. (ROI, Tabs B1-B6.)

As evidence of disability harassment, Complainant testified that her coworkers and management were unhappy because she could not always perform her duties due to her disability.  However, she failed to substantiate her testimony with corroborative evidence. (ROI, Tabs B1-B8.)

Complainant did not offer evidence to establish that she was harassed based on her race.  Although she testified that she was offended by Ms. MA's use of the nickname "Tar Baby" in reference to a mutual coworker, she also testified that the nickname was based on the color of the coworker's skin, not her race.  Specifically, she testified that most of the LPNs at the LCBOC, including herself, were "light-skinned" African-Americans but the coworker Ms. MA, nicknamed Tar Baby, had very dark skin.  Complainant testified that the coworker was highly offended when she heard about the nickname and that she "felt saddened" for the coworker.

We are aware that a complainant can be subjected to a hostile work environment based on discriminatory conduct not specifically directed at her.[14]  However, we find, because the discriminatory nickname was not directed at Complainant or Complainant's protected class, combined with the fact that the nickname was not used in Complainant's presence, or even in the presence of the targeted coworker, being made aware of Ms. MA's use of the derogatory nickname alone does not rise to the level of severity and pervasiveness necessary to establish a hostile work environment.  Discovering that a coworker had been demeaned behind her back based on the color of her skin was highly offensive and gave rise to a feeling of sympathy in Complainant, but, according to the evidence in the record, it did not, alone, create a hostile work environment for Complainant based on race. (ROI, Tabs B1-B8; C4.)

---

[13] See, McFadden v. Dept. of Justice, EEOC Appeal No. 0720110034 (2012) (finding that an investigation ordered against an employee by an upper management official who was made aware of the employee's previous discrimination complaints through the chain of command constituted reprisal).
[14] See, Scillo v. Secretary of Commerce, EEOC Appeal No. 01A62515 (2006).

Based on Complainant's failure to produce adequate evidence to establish that she was harassed based on her race, disability, or prior EEO activity, we find that Complainant failed to prove that she was subjected to a hostile work environment due to her race, disability, or prior EEO activity. (ROI, Tabs B1-B8.)

## Harassment Based on Sex (Sexual Harassment)

Complainant belongs to a protected class under Title VII based on her sex. Also, we find that the evidence in the record establishes that Complainant was subjected to unwelcome verbal conduct of a sexual nature when Ms. MA made comments about Complainant's sexual orientation and an alleged homosexual relationship with a female coworker. Witness testimony and an AIB report in the record establish that Ms. MA did, in fact, make comments to her fellow LPNs regarding Complainant's alleged sexual orientation, stating that Complainant was gay and was involved in a homosexual relationship with a female coworker. (ROI, Tabs B1-B8; C3; C4.)

We further find that Complainant presented evidence to establish that Ms. MA's comments regarding her sexuality were based on Complainant's sex. Specifically, we find that the evidence establishes that it was Ms. MA's intention to degrade Complainant as a female by stating that Complainant was gay and was involved in a sexual relationship with another female rather than with a male. (ROI, Tabs B1-B8; C3; C4.)

Finally, according to EEOC case law and the facts in this case, we find that Ms. MA's pattern of comments regarding Complainant's sexuality constitute harassment sufficiently severe and pervasive to create a hostile work environment. Brooker v. U.S. Postal Service, EEOC Request No. 0520110680 (2013) (a pattern of comments and rumors referring to a complainant as being gay can be severe or pervasive enough to rise to the level of sexual harassment). In this case, Complainant was not only subjected to Ms. MA's comments regarding her sexuality and alleged involvement in a homosexual relationship but also to Ms. MA's comments to other LPNs that Complainant has sex with patients of the LCBOC for money. As Complainant testified, Ms. MA was "telling people that [Complainant is] gay and a prostitute." We find that Ms. MA's comments were, disparaging, sexual, based on Complainant's sex, and sufficiently severe and pervasive to create a hostile work environment. (ROI, Tabs B1-B8; C3; C4.)

Ms. MA's harassment of Complainant is rooted in her statements about Complainant's sexuality. However, as further evidence of the severity of Complainant's hostile work environment, we find that Ms. MA engaged in other conduct that exacerbated the existing hostile work environment.[15] The evidence establishes that Ms. MA made verbal threats about Complainant and others, stating that she would like to tie them up, put them in her trunk, and throw them in the Bayou. We find that the addition of a violent threat reasonably increased the hostility Complainant experienced at work. Likewise, we find that becoming aware that Ms. MA referred to Complainant as "Junkie", as well

---

[15] See, Black v. Zaring Homes. Inc., 104 F.3d 822 (6th Cir. 1997).

as gay and a prostitute, contributed to Complainant's hostile work environment. Finally, although we find that becoming aware that Ms. MA nicknamed her coworker, Tar Baby. did not by itself create a hostile work environment for Complainant based on her race, we find that becoming aware of Ms. MA's use of such a severely discriminatory nickname and how deeply it offended Complainant's friend and coworker added to the overall hostility of her work environment. (ROI, tabs B1-B8; C1-C4.)

For these reasons, and based on the entirety of evidence in the record, we find that Complainant has shown that she was subjected to a discriminatory hostile work environment based on her sex.

### Agency Liability

Even where a harasser's discriminatory conduct is sufficiently severe and pervasive to create a hostile environment, an agency can avoid liability by promptly investigating and taking prompt and effective remedial action. Douglass v. Postmaster General, 0120091037 (2010),

The Commission has held that a three-week delay before starting an investigation into harassment allegations is not prompt. Coley v. Postmaster General, 0120062109 (2008). More recently, the Commission held that the Agency failed to take prompt corrective action when it delayed two weeks in responding to a harassment complaint where the alleged harassment was severe and included physical touching. Rockymore v. Postmaster General, 0120110311 (2012).

In this case, Complainant met with Ms. MA, her harasser, Ms. GS, her direct supervisor, and two witnesses on May 15, 2012. At the meeting, Complainant made each attendee, including Ms. GS, aware of every harassment allegation involved in this complaint, including Ms. MA's comments about her sexual orientation and alleged sexual activity. Ms. GS did not take any action in response to the meeting. She testified, "The overall outcome of the meeting was that whatever happened in the room, whatever was discussed, said in the room, will stay in the room. They will start fresh, and then move forward. But the parties wanted to, you know, just get it out in the open and air out their concerns." (ROI, Tabs B1-B4.)

During the meeting, Complainant was under the impression that Ms. MA was admitting to, and apologizing for, making the inappropriate, discriminatory statements that had created a hostile work environment and, thus, seemed willing to attempt to move forward without more formal action. However, evidence in the record establishes that immediately after the meeting, Ms. MA contacted Ms. GS and denied making any of the statements alleged by Complainant. She proceeded over the following week to contact Ms. AL to claim that she was subjected to a hostile work environment by Complainant at the May 15, 2012, meeting. Ms. AL responded to Ms. MA's claims of harassment by ordering a fact-finding inquiry, which was scheduled to begin on June 20, 2012. The purpose of the fact-finding was to gather evidence related to Ms. MA's allegations against Complainant. (ROI, Tabs B1-B8; C1.)

We find that the evidence establishes that Ms. GS failed to take prompt effective remedial action when she became aware of Complainant's hostile work environment allegations against Ms. MA. In fact, she took no action at all. The evidence establishes that she expected to "start fresh" after the meeting even though it was evident that neither Complainant nor Ms. MA was willing to move on with a fresh start. (ROI, Tab B1-B8.)

We find that Ms. GS's inaction led to exacerbation of Complainant's hostile work environment when she was informed on June 19, 2012, that she was the subject of a fact-finding inquiry related to Ms. MA's harassment allegations against her. Ms. MA continued to create a hostile work environment for Complainant after May 15, 2012, by denying Complainant's allegations and by reporting to Ms. AL that Complainant was creating a hostile work environment towards her. Because Ms. GS failed to take prompt, effective action as soon as Ms. MA denied Complainant's allegations on May 15, 2012, (as directed in the EEOC's harassment guidance) Complainant was made the target of a fact-finding based on Ms. MA's report to Ms. AL, deepening the hostility in her work environment. *See*, EEOC Notice 915.002: Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors (1999). (ROI, Tabs B1-B8.)

After the scheduled June 20, 2012, fact-finding inquiry was cancelled, Complainant filed a formal EEO complaint on July 11, 2012. On September 26, 2012, the facility Director ordered an AIB, and Ms. MA was detailed to a different CBOC in Jennings, Louisiana, during the investigation. The results of the AIB were issued on November 5, 2012, and recommended that Ms. MA remain at her new detail location permanently due to the hostile work environment she created in the LCBOC. The agency adopted the AIB recommendation and reassigned Ms. MA permanently. (ROI, Tabs B1-B8; C3.)

We find that effective action was initiated on September 26, 2012. However, the effective action was not prompt. Ms. GS was made aware of the alleged harassment on May 15, 2012. Ms. BN, the Associate Chief Nurse, and Ms. AL, the Nurse Executive, were aware of the allegations against Ms. MA by June 20, 2012, at the latest. Effective action was taken on September 26, 2012, more than four months after Ms. GS, and more than three months after Ms. BN and Ms. AL, became aware of the hostile work allegations against Ms. MA. Thus, we find that Agency officials failed to take prompt, effective action to stop the hostile work environment that Ms. MA created for Complainant. (ROI, Tabs B1-B8.)

For these reasons, we find that the Agency is liable for Complainant's discriminatory hostile work environment.

## CONCLUSION

Complainant proved that she was subjected to a hostile work environment based on her sex for which the Agency is liable.

## REMEDIAL RELIEF

In view of the above finding of discrimination, we order the following relief and corrective action.

### 1. Equitable Relief

As a result of the finding of discrimination, the Complainant is entitled to full, make-whole relief pursuant to 29 C.F.R. Section 1614.501(a).  Therefore, pursuant to 29 C.F.R. Section 1614.501(a)(5), the agency will commit to the complainant in writing that it will cease from engaging in the unlawful employment practice found in this case, namely, sexual harassment and harassment based on sex, that it will not engage in similar unlawful employment practices, that it will provide the complainant a work place free from hostility, offensive conduct or abuse, and that no reprisal will be taken against the complainant for filing and pursuing this or any other complaint under federal EEO law.

Management will implement the remedial relief ordered in the foregoing paragraph within 30 days of its receipt of this decision.

### 2. Compensatory Damages

The Department is liable for losses caused by the discrimination which occurred in this case.  Although the complainant did not specifically request compensatory damages, the evidence reasonably raises the possibility that the complainant suffered losses which other forms of relief may not cover.  However, there is insufficient evidence in the record from which to determine whether, or to what extent, the complainant has incurred pecuniary or nonpecuniary losses due to the discrimination.  Accordingly, we defer a decision on the specific amount of damages to be awarded pending receipt of a supplemental investigation report on the issue of damages.

Briefly, the complainant must provide verifiable, objective evidence that (1) she incurred the damages and (2) that the damages resulted from the discrimination.  A mere statement that the complainant deserves compensation for embarrassment, humiliation, lack of sleep, emotional distress, anxiety, etc., without supporting evidence, is not sufficient. Compensatory damage claims must be accompanied by evidence of both the injury or loss that was incurred and the connection between the injury or loss and the discriminatory conduct.

Compensatory damages may be claimed for past pecuniary losses, future pecuniary losses, and non-pecuniary losses. *Past pecuniary losses* are monetary or out-of-pocket expenses, such as medical, moving, or job search expenses, which the complainant has already incurred as a result of the discriminatory conduct.  Evidence of such damages must establish two elements.  First, the amount of the damages must be

established through objective evidence such as bills, receipts, or canceled checks. Second, the evidence must establish the causal relationship between the discriminatory conduct and the alleged damages. *Future pecuniary losses* are out-of-pocket expenses, such as medical care or counseling, which will be incurred in the future because of the discriminatory conduct. Evidence of such damages usually requires expert testimony, and must establish three elements: (1) the likelihood of future expenses; (2) the approximate amount of future expenses; and (3) the causal relationship between the discriminatory conduct and the future expenses. *Non-pecuniary losses* are non-monetary harms or injuries, which are impossible to quantify exactly, such as pain and suffering, or loss of enjoyment of life. Evidence of non-pecuniary losses must show the nature, duration, severity, and cause of the claimed injury.

In accordance with guidance set forth in <u>Broughton v. U.S. Postal Service</u>, EEOC Appeal No. 01951999 (April 25, 1995), the complainant is further advised as follows concerning claims of compensatory damages.

1.    The complainant should submit objective evidence such as statements concerning emotional pain or suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character or reputation, injury to credit standing, loss of health, and any other non-pecuniary losses that the complainant believes were incurred as a result of the discriminatory conduct. Such statements shall include a statement from the complainant describing and itemizing <u>in specific detail</u> the claimed damages.

2.    The complainant may submit statements from credible witnesses, including family members, friends, health care providers, and other counselors (including clergy) describing the damages incurred and the types of treatments and/or medications prescribed. Such statements may address, for example, the outward manifestations or physical consequences of emotional distress, including anxiety, sleeplessness, stress, depression, marital strain, fatigue, or a nervous breakdown. In order for these statements to be acceptable as evidence, these witnesses must indicate that (a) <u>their statements are based on personal knowledge obtained through their own observations</u>, (b) must include <u>specific, detailed</u> information on the <u>physical and/or behavioral manifestations</u> of the pain, distress, anguish, etc.; (c) must include <u>information on the duration</u> of the distress or anguish (i.e., when did they first notice these manifestations and how long did these manifestations last; (d) must include specific <u>examples</u> of how the distress, anguish, etc., affected the complainant day to day, both on and off the job; and (e) must indicate the types of medication and/or treatment prescribed, if applicable.

3.    Objective evidence also may include proof of the complainant's actual out-of-pocket expenses (bills, receipts, etc.) related to medical treatment, counseling, medications, and so forth, that are directly related to or caused by the discrimination. If reimbursement is claimed for other types of losses or expenses, the complainant must provide credible evidence, such as bills, receipts, canceled checks or other verifiable evidence indicating the exact nature and date(s) of the loss and/or expense.

4.     The complainant must establish a connection between the discriminatory action and the alleged resulting non-pecuniary harm or injury. Hence, any evidence of medical expenses should include medical documentation such as statements from medical or other health care professionals who have treated the loss or injury claimed. If the medical condition existed prior to the discrimination, the complainant must submit medical or other credible evidence indicating whether or not the condition worsened as a result of the discrimination, the length of time the complainant had the condition prior to the discrimination, the type of medical treatment the complainant received for the condition, and who provided the treatment. Evidence regarding other types of losses or expenses must also indicate (a) the exact nature of the loss or expense, (b) the date(s) of the loss, and (c) any other information that proves that the loss or expense occurred as a result of the alleged discrimination.

5.     A request for compensatory damages may require the complainant to disclose personal and sensitive information to the agency to enable the agency to determine whether the claimed harm or injury is linked in whole or in part to the discriminatory conduct.

This office has requested the Department's Office of Resolution Management (ORM) to conduct a supplemental investigation in order to obtain any additional information needed to reach a just and proper determination of the amount of damages to be awarded. Upon receipt of this decision, the complainant shall have forty-five (45) days in which to provide the ORM investigator with any and all objective evidence, as described in the preceding paragraphs, pertinent to compensatory damages. The ORM investigator will contact the complainant to obtain this evidence. Thereafter, based on the record, the evidence provided by the complainant, and any additional evidence gathered in the supplemental investigation, this office will issue a final agency decision on damages. The decision will advise the complainant of the right to appeal the decision to the EEOC and the right to file a civil action.

If the complainant wishes to negotiate a settlement of the damages award with the facility director or staff office head, rather than having this office decide it, the complainant should simultaneously submit the above requested information regarding damages both to the ORM investigator and the facility Director or staff office head, or that official's legal representative. Any such agreement must be reached prior to the issuance of a final agency decision by this office. The Department will not delay investigation and issuance of a decision on damages because of settlement negotiations unless the complainant requests an extension of time in writing.

## 3. Attorney Fees

The record in this case does not indicate that the complainant is represented by an attorney. However, the complainant may have recently retained an attorney to assist in the further processing of the complaint. Therefore, we provide the following information concerning claims for attorney's fees and costs.

Any claim for fees must include a verified statement from the attorney of costs and attorney's fees. The statement must be accompanied by an affidavit from the attorney itemizing the charges for legal services. Specifically, the affidavit should chronologically detail the dates on which services were rendered, the person providing such services, the nature and extent of the services performed, and the number of hours expended. This affidavit is only a reconstruction of the services provided and does not, in itself, justify an award of attorney's fees. To be compensable, such services must be documented by contemporaneous billing records prepared the same day on which the services were actually provided. Consequently, copies of the applicable billing records must accompany both the affidavit and verified statement.

In addition to the above information, the affidavit must contain a statement as to the attorney's usual and customary hourly charge, as well as the usual and customary hourly charge for each person who worked on this case. It should, to the extent applicable, explain any distinction between in court and out of court fees, whether the fee was fixed or contingent, the nature and length of the professional relationship with this complainant, and any other factors which might affect the amount of attorney's fees in this case. The affidavit must describe the training and experience of each person who worked on this case, and the date of bar membership as applicable.

The claim should also include affidavits from other attorneys attesting to the prevailing market rate in the relevant geographic area for similar services, and any evidence regarding hourly rates that have been awarded in prior cases. It is the attorney's responsibility to prove the reasonableness of the requested hourly rate. The claim for fees must include a copy of the fee agreement between counsel and the complainant.

Finally, the claim must include any documentation (bills, receipts, statements, invoices, express or certified mail receipt numbers, delivery service documents, etc.) to support any charges for costs billed to the complainant. Failure to provide adequate documentation may result in denial of the claimed costs.

Except as noted below, EEOC's regulations permit payment of an attorney fee award only for services performed after the filing of the formal, written complaint, and after notification to the agency that the complainant is represented by an attorney. However, the regulations do permit compensation for services rendered prior to such notification for a reasonable amount of time spent deciding whether to represent the complainant. In addition, the regulations permit compensation for services rendered prior to the filing of a complaint where an EEOC administrative judge issues a decision finding discrimination, the Department issues an order that does not implement the decision, and EEOC upholds the administrative judge's decision on appeal.

Any claim for fees and costs must be submitted both to this office and to the VA facility director or staff office head, or that official's legal representative, within 30 days of receipt of this decision. The submission to this office must indicate that a copy of the claim was served on that official or legal representative. This office will issue a final fee

decision within 60 days of receipt of the claim, <u>provided</u> a copy of the claim has been served on the above official.  The final fees decision will include notice of the right to appeal the decision respecting the amount of the attorney fee award.

If the complainant wishes to negotiate a settlement of the attorney's fee award <u>with the facility director or staff office head</u>, rather than having this office decide it, such an agreement must be reached <u>prior</u> to the issuance of a final agency decision by this office.  This office will not delay issuance of a decision on attorney's fees because of settlement negotiations unless the complainant's attorney files a written request for an extension of time with this office.

## 4. Costs

The Complainant is entitled to costs associated with the prosecution of this claim.  The costs may include mailing, photocopying, and any other reasonable out-of-pocket expenses.  A claim for costs must be filed with this office within **60** days of receipt of this decision.  The claim <u>must</u> itemize the costs and be accompanied by documentary evidence (such as bills and receipts) to support the claim.  Failure to provide such documentation will result in denial of the claim.

## 5. Other Corrective Action

In addition to making the complainant whole, a remedy must be tailored to correct the particular source of the identified discrimination and to minimize the chance of its recurrence.  Therefore, pursuant to 29 C.F.R. Section 1614.501(a)(2), the agency will take whatever corrective, curative, and preventive actions and will adopt whatever measures are necessary to ensure that violations of federal EEO law similar to those found in this case do not recur.

To this end, management must ensure that Ms. MA is permanently assigned to a different facility than Complainant.  Ms. MA must also receive 8 hours of EEO training, specifically training regarding harassment and what it means to discriminate.  The training shall be mandatory, conducted by an Office of Resolution Management (ORM) subject matter expert, and completed within 90 days of the issuance of this Final Agency Decision.  If an ORM trainer is unavailable, ORM will provide the training content, and the trainer identified by the facility must be certified by ORM as an EEO subject matter expert.

The Agency should also take action with respect to the management officials responsible for the continued harassment in this case by providing Ms. GS, Ms. BN, and Ms. AL, each with 4 hours of EEO training regarding discriminatory harassment and management's responsibilities under Title VII.  The training shall be mandatory, conducted by an Office of Resolution Management (ORM) subject matter expert, and completed within 90 days of the issuance of this Final Agency Decision.  Again, if an ORM trainer is unavailable, ORM will provide the training content, and the trainer identified by the facility must be certified by ORM as an EEO subject matter expert.

An appropriate management official shall sign and conspicuously post, at both the Lafayette and Alexandria, Louisiana, facilities, the attached notice of violation for a period of not less than 60 days.

## RIGHT OF APPEAL

Within 30 days of receipt of this final decision, the complainant has the right to appeal it to **Equal Employment Opportunity Commission, Office of Federal Operations, P.O. Box 77960, Washington, D.C. 20013**. If an appeal is filed, EEOC Form 573 should be used. A copy of EEOC Form 573 is attached.

A copy of the appeal to the EEOC **must** also be sent to the VA Office of General Counsel at the following address: **Department of Veterans Affairs, Office of the General Counsel (024), 810 Vermont Ave., N.W., Washington, D.C. 20420**.

Statements or briefs in support of the appeal **must** be submitted to the EEOC within 30 calendar days of the filing of the appeal. <u>A copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement", must also be sent to the VA's Office of General Counsel at the above address</u>.

If an appeal is filed with the EEOC, the appeal, and any subsequently filed statement or brief, **must** contain a statement certifying the date and method by which copies of these documents were served on the VA's Office of General Counsel.

If the complainant files an appeal with the Commission beyond the above-noted time limit, the complainant should provide the Commission with an explanation as to why the appeal should be accepted despite its untimeliness. If the complainant cannot explain why timeliness should be excused, the Commission may dismiss the appeal as untimely.

## RIGHT TO FILE A CIVIL ACTION

The complainant also has the right to file a civil action in an appropriate United States District Court. The complainant may file a civil action

> within 90 days of receipt of this final decision <u>if no appeal to EEOC has been filed</u>; or

> within 90 days after receipt of the EEOC's final decision on appeal; or

> after 180 days from the date of filing an appeal with the EEOC if there has been no final decision by the Commission.

The complainant **must** name the person who is the official head of the Department of Veterans Affairs as the defendant. Department means the national organization, and

# EXHIBIT "C"

# AFFIDAVIT

STATE OF LOUISIANA

Versus No.

Mary Andrus

Address: 131 Hebert Rd.

Lafayette, La. 70506

STATE OF LOUISIANA

Parish of St. Martin

Before me, the undersigned authority in and for the Ward and Parish aforesaid personally appeared Lt Marcus Guidry of the Parish and State Aforesaid, who being duly sworn, deposes and says that Mary Andrus late of the Parish of Lafayette on or about the 4th day of March 1999         , in the Parish of St. Martin did:

1. commit La. R.S. 14:93.3 cruelty to the infirmed

against the peace and dignity of the State of Louisiana. The affiant charges that the accused committed the above described offense based on the following information:

On 5-17-00 this affiant met with Ricky Hayes at the St. Agnes Nursing Home in Breaux Bridge regarding the mistreatment of residents in the alzheimers unit by one of the nursing staff. Ricky Hayes is the administrator for St. Agnes Nursing Home. Ricky Hayes told this affiant that on March 9, 1999 it was brought to his attention that LPN Mary Andrus had given a cold shower to resident Ruby Authement. Ruby Authement was found to be playing in a bowel movement she had and created a mess, which had to be attended to by LPN Mary Andrus. As a form of punishment LPN Mary Andrus ordered two nursing aids Valerie Taylor and Barbara Thomas to wash Ruby Authement with cold water as a form of punishment. Both Valerie Taylor and Barbara Thomas refused to spray Ruby Authement with the cold water. LPN Mary Andrus took the shower and proceeded spray Ruby Authement with cold water. At the time of the incident there was no noted physical injury. Both Valerie Taylor and Barbara Thomas who reported this incident to Ricky Hayes witnessed this.

Ruby Authement is a resident in the alzheimers unit and is not capable of describing any incident due to her diminished mental capacity. Ruby Authement at the time of this incident was 82 years of age.

Ricky Hayes told this affiant that on March 11, 1999 a second complaint was filed with him regarding LPN Mary Andrus mistreating a resident Hilda St. Julien. Hilda St. Julien is also a resident of the alzheimers unit. This complaint was filed by Valerie Taylor and Joy Meaux two nursing aids that witnessed the abuse.

On the morning of March 6, 1999 between the hours of 4:00 a.m. and 6:00 a.m. Valerie Taylor and Joy Meaux were getting the residents up for showers. Resident Hilda St. Julien started to give trouble while she was in the dinning room. LPN Mary Andrus took Hilda St. Julien and put her out side on the back porch in the cold weather to punish her. This affiant was told by nursing assistant Joy Meaux that Hilda St. Julien was kept outside five minutes or longer than brought back in by LPN Mary Andrus. Ricky Hayes told this affiant that on the day of the incident it was very cold outside and no one should have even been brought outside at that time in the morning. This affiant contacted the

National Weather Service in Lake Charles and determined that the temperature at 6:00 a.m. on March 6, 1999 was recorded to be 57 degrees.

Hilda St. Julien is a resident in the alzheimers unit and is not capable of describing any incident due to her diminished mental capacity. Ruby Authement at the time of this incident was 96 years of age.

LPN Mary Andrus was terminated on March 11, 1999 after the two incidents were brought to Ricky Hayes attention. Both reported incidents were sent to Ms. Shirley Smith, Health Standards Section with the Department of Health & Hospitals. Department of Health & Hospitals within 24 hours as required by the Department of Health & Hospitals. Department of Health & Hospitals has closed the case due to the fact LPN Mary Andrus was terminated and there are no means of any further abuse to the residents of St. Agnes Nursing Home.

This affiant is requesting that a warrant of arrest be issued on LPN Mary Andrus for Cruelty to the infirmed.

Wherefore the affiant prays that said Mary Andrus be arrested and dealt with according to law.

Sworn to and subscribed before me this 23rd day of May 20 00

NOTARY-JUSTICE OF THE PEACE-JUDGE

COMPLAINANTS SIGNATURE
Address: SMSO

WITNESSESS TO THE OFFENSE

| Name | Address | Phone |
| --- | --- | --- |
| Barbara Lynn Thomas | 972 Landdry Street, Breaux Bridge | 332-1012 |
| Valerie A. Taylor | 2242 Doyle Melancon Rd., Breaux Bridge | 332-1843 |
| Joy Meaux | 250 blue Rose Dr., Crowley, La. | 788-0873 |

# EXHIBIT "D"

# Suspect Rap Sheet



| | | | |
|---|---|---|---|
| SID: | | ATN: | 500010000878 |
| LBN: 00000984 | | | |

| | | |
|---|---|---|
| Last Name: **ANDRUS** | | Initial: |
| First Name: **MARY** | | Suffix: |

Address:
131     HEBERT          RD
LAFAYETTE          LA   70506

Race: B     Sex: F          Height: 5' 05     Weight: 220

DOB: 12/01/1964     Birth Place: LA

Booking Date: Fri Jun 23 12:39:18 2000

SSN:

FBI No.:

DLN:          State: LA

Charge Agency: 5000

Gang Affiliations:

| | | |
|---|---|---|
| Mustache: NONE | Skin Tone: MED | Hair Color: BRO |
| Beard: NONE | Body Build: HEAVY | Hair Length: CURLY |
| | | Eye Color: BRO |

Scars:

| Type: | Location: |
|---|---|
| CUT | TORSO FRONT |

Tattoos:

| Type: | Location: | Litteral: |
|---|---|---|

Marks:

| Location: |
|---|

Notes: